UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :          SEALED INDICTMENT

          - v. -                  :

                                  :          S7 18 Cr. 184 (VSB)

BENJAMIN TAYLOR and               :
DARINA WINDSOR,

                                  :

          Defendants.

                                  :

- - - - - - - - - - - - - - - X

## COUNT ONE
### (Conspiracy to Commit Securities Fraud and Fraud in Connection with a Tender Offer)

The Grand Jury charges:

### Relevant Individuals and Entities

1.   At all times relevant to this Indictment, Investment Bank A was a global investment banking advisory firm with offices in, among other locations, London, England, and Manhattan, New York.

2.   At all times relevant to this Indictment, Investment Bank B was a global investment banking advisory firm with offices in, among other locations, London, England, and Manhattan, New York.

3.   At certain times relevant to this Indictment, BENJAMIN TAYLOR, the defendant, was employed in the investment banking division of Investment Bank A.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

4.   At certain times relevant to this Indictment, DARINA WINDSOR, the defendant, was employed in the investment banking division of Investment Bank B.

5.   At certain times relevant to this Indictment, DARINA WINDSOR and BENJAMIN TAYLOR, the defendants, were involved in a romantic relationship with each other and resided together in an apartment located in London (the "Apartment").

6.   At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-1") was a friend of DARINA WINDSOR and BENJAMIN TAYLOR, the defendants, residing in Europe.

7.   At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-2") was a friend of DARINA WINDSOR and BENJAMIN TAYLOR, the defendants, residing in Europe.

8.   At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-3") was a securities trader residing in Switzerland.

9.   At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-4") was a securities trader residing in England.

10.   At all times relevant to this Indictment:

a.   Reliance Steel & Aluminum Co. ("Reliance") was a metals services center operator with headquarters in Los

2

Angeles, California.  Reliance's securities traded under the symbol "RS" on the New York Stock Exchange ("NYSE").  During this time period, Reliance was a client of Investment Bank A.

b.   Metals USA Holdings Corp. ("Metals") was a metals processing and inventory management company with headquarters in Florida.  Metals' securities traded under the symbol "MUSA" on the NYSE.  During this time period, Metals was the target of an acquisition by Reliance.

c.   Life Technologies Corporation ("Life") was a biotechnology company with headquarters in Carlsbad, California. Life's securities traded under the symbol "LIFE" on the NASDAQ Stock Exchange ("NASDAQ").  During this time period, Life was a client of Investment Bank A.

d.   AmerisourceBergen Corporation ("ABC") was a pharmaceutical wholesale company with headquarters in Chesterbook, Pennsylvania.  ABC's securities traded under the symbol "ABC" on the NYSE.  During this time period, ABC was involved in negotiations regarding a strategic alliance with a company that was a client of Investment Bank B.

e.   Heidrick & Struggles International, Inc. ("Heidrick") was a global executive search company with headquarters in Chicago, Illinois.  Heidrick's securities traded under the symbol "HSII" on NASDAQ.  During this time period, Heidrick was a client of Investment Bank B.

f.    Onyx Pharmaceuticals Inc. ("Onyx") was a biopharmaceutical company with headquarters in San Francisco, California.  Onyx's securities traded under the symbol "ONXX" on NASDAQ.  During this time period, Onyx was a client of Investment Bank B.

g.    Amgen Inc. ("Amgen") was a biopharmaceutical company with headquarters in Thousand Oaks, California.  Amgen's securities traded under the symbol "AMGN" on NASDAQ.  During this time period, Amgen offered to acquire Onyx.

h.    Idenix Pharmaceuticals, Inc. ("Idenix") was a pharmaceutical company with headquarters in Cambridge, Massachusetts.  Idenix's securities traded under the symbol "IDIX" on NASDAQ.  During this time period, Idenix was a client of Investment Bank B.

i.    Merck & Co., Inc. ("Merck") was a pharmaceutical company with headquarters in Kenilworth, New Jersey.  Merck's securities traded under the symbol "MRK" on the NYSE.  During this time period, Merck offered to acquire, and acquired, Idenix.

j.    InterMune, Inc. ("Intermune") was a biotechnology company with headquarters in Brisbane, California.  Intermune's securities traded under the symbol "ITMN" on NASDAQ.  During this time period, Intermune was a client of Investment Bank B.

k.    Avanir Pharmaceuticals, Inc. ("Avanir") was a

4

pharmaceutical company with headquarters in Aliso Viejo, California.  Avanir's securities traded under the symbol "AVNS" on NASDAQ.  During this time period, Avanir was a client of Investment Bank B.

l.   Otsuka Pharmaceutical Co., Ltd. ("Otsuka") was a healthcare company with headquarters in Tokyo, Japan.  During this time period, Otsuka offered to acquire, and acquired, Avanir.

m.   Hyperion Therapeutics, Inc. ("Hyperion") was a biopharmaceutical company headquartered in San Francisco, California.  Hyperion's securities traded under the symbol "HPTX" on NASDAQ.  During this time period, Hyperion was a client of Investment Bank B.

n.   Horizon Pharma plc ("Horizon") was a pharmaceutical company with headquarters in Dublin, Ireland. Horizon's securities traded under the symbol "HZNP" on NASDAQ. During this time period, Horizon offered to acquire, and acquired, Hyperion.

o.   Pharmacyclics Inc. ("Pharmacyclics") was a biopharmaceutical company with headquarters in Sunnyvale, California.  Pharmacyclics' securities traded under the symbol "PCYC" on NASDAQ.  During this time period, Pharmacyclics was a client of Investment Bank B.

p.   Receptos Inc. ("Receptos") was a biotechnology

company with headquarters in San Diego, California.  Receptos'
securities traded under the symbol "RCPT" on NASDAQ.  During
this time period, Receptos was a client of Investment Bank B.

       q.    Celgene Corporation ("Celgene") was a
biopharmaceutical company with headquarters in Summit, New
Jersey.  Celgene's securities traded under the symbol "CELG" on
NASDAQ.  During this time period, Celgene offered to acquire,
and acquired, Receptos.

       r.    Omnicare, Inc. ("Omnicare") was a health care
company with headquarters in Cincinnati, Ohio.  Omnicare's
securities traded under the symbol "OCR" on the NYSE.  During
this time period, Omnicare was a client of Investment Bank B.

       s.    Thoratec Corporation ("Thoratec") was a medical
device company with headquarters in Pleasanton, California.
Thoratec's securities traded under the symbol "THOR" on the
NASDAQ.  During this time period, Thoratec was a client of
Investment Bank B.

       t.    Solera Holdings, Inc. ("Solera") was a digital
technology company with headquarters in Westlake, Texas.
Solera's securities traded under the symbol "SLH" on NYSE.
During this time period, Solera was a client of Investment Bank
B.

       u.    EnerSys ("EnerSys") was a manufacturing company
with headquarters in Reading, Pennsylvania.  EnerSys' securities

traded under the symbol "ENS" on the NYSE.

v.   Johnson Controls International PLC ("Johnson Controls") was a diversified technology company with headquarters in Milwaukee, Wisconsin.  Johnson Controls' securities traded under the symbol "JCI" on the NYSE.  During this time period, Johnson Controls was a client of Investment Bank B and was engaged in discussions about the potential acquisition of EnerSys.

**Access to Inside Information and Prohibition on Insider Trading**

11.  By virtue of their employment at Investment Bank A and Investment Bank B, respectively, BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, had access to material, non-public information ("MNPI") relating to corporate transactions.  For instance, both TAYLOR and WINDSOR were able to access computer files relating both to transactions to which they were assigned, and those to which they were not assigned.

12.  At all times relevant to this Indictment, Investment Bank A and Investment Bank B maintained policies and procedures that prohibited insider trading, including the disclosure of MNPI to third parties.  During the course of their employment, BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, each attested that they were in compliance with, respectively, Investment Bank A's and Investment Bank B's policies and procedures prohibiting insider trading.

## Overview of the Insider Trading Scheme

13.   From in or December 2012 through in or about February 2018, BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, participated in a large-scale, international insider trading ring.   In violation of their duties of trust and confidence, and for their own personal benefit, TAYLOR and WINDSOR stole MNPI from Investment Bank A and Investment Bank B relating to numerous corporate transactions.   TAYLOR and WINDSOR sold this MNPI to CC-1 and CC-2, middlemen who TAYLOR recruited to join the scheme, in exchange for over $1 million of benefits, including cash, trips and luxury watches.   TAYLOR and WINDSOR understood that CC-1 and CC-2 would pass the MNPI to securities traders, who would execute timely, profitable securities transactions based on this MNPI and in advance of the MNPI becoming public.   Ultimately, the insider trading scheme yielded at least tens of millions of dollars of illicit profits.

## Means and Methods of the Conspiracy

14.   During the course of the scheme, BEJAMIN TAYLOR and DARINA WINDSOR, the defendants, stole MNPI from Investment Bank A and Investment Bank B by accessing computer systems at those investment banks containing such MNPI.   TAYLOR would pass MNPI he had stolen from Investment Bank A to CC-1 and CC-2, with the understanding that CC-1 and CC-2 would pass the MNPI to securities traders.   WINDSOR would pass MNPI she had stolen from

Investment Bank B to TAYLOR, who in turn passed it to CC-1 and CC-2, with the understanding (shared by both TAYLOR and WINDSOR) that CC-1 and CC-2 would pass the MNPI to securities traders.

15.   BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, collected both information about the progress of potential corporate transactions, as well as internal Investment Bank A and Investment Bank B documents relating to those potential transactions, for purposes of passing the information and documents to CC-1 and CC-2.  For example, on or about October 10, 2012, WINDSOR sent an email to TAYLOR titled "Once upon a time, there was a Pops searching for Truffles in the Forest..." "Pops" and "Popsy" were names that TAYLOR and WINDSOR used to refer to each other.  Attached to the email was confidential information relating to Onyx, one of Investment Bank B's clients, which WINDSOR had obtained from Investment Bank B's computer systems.

16.   When BENJAMIN TAYLOR, the defendant, provided confidential information and documents to CC-1 and CC-2, he often did so in person.  CC-1 and CC-2 then provided confidential information and documents to securities traders, including CC-3 and CC-4, often in person as well.  TAYLOR took steps to conceal his unlawful relationship with CC-1 and CC-2. The three used encrypted messaging applications and unregistered "burner" cellphones to communicate with each other and arrange

in-person meetings to discuss their scheme.

17. CC-3, CC-4, and the other traders who received the MNPI that had been misappropriated by BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, then purchased securities of the companies that were involved in the transactions based on that MNPI. The traders sold those securities after the acquisitions or offers for acquisitions were publicly announced and the acquisition targets' stock price rose.

18. To further effectuate the scheme and to ensure profitable securities trading based on the stolen MNPI, CC-3 occasionally provided MNPI that CC-3 had obtained from BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, to journalists for the purpose of causing them to write news stories relating to the MNPI that could influence a company's stock price. For example:

a. From on or about January 7, 2013, up to and including on or about January 11, 2013, TAYLOR accessed documents within Investment Bank A relating to the potential acquisition of Life, a client of Investment Bank A. TAYLOR provided some of those documents to CC-1, who in turn provided them to CC-3. After purchasing Life securities, CC-3 emailed the documents to a journalist ("Journalist-1") who thereafter published an article reporting that Life was a potential acquisition target. Life's stock price increased the following

day, and CC-3 profited by over $1 million.

     b.   CC-3 also emailed MNPI to Journalist-1 relating to companies whose information WINDSOR accessed on Investment Bank B's computer systems.  For example, on or about May 16, 2013, WINDSOR accessed documents relating to the potential acquisition of Heidrick, a client of Investment Bank B.  CC-3 had already begun purchasing Heidrick securities.  CC-3 later emailed confidential documents relating to the acquisition of Heidrick to Journalist-1, who thereafter published an article reporting that Heidrick was a potential acquisition target. Heidrick's stock price increased after the article was published, and CC-3 thereafter sold Heidrick securities and profited by approximately $264,000.

     19.  After BENJAMIN TAYLOR, the defendant, left the employment of Investment Bank A in or about 2015, and DARINA WINDSOR, the defendant, was terminated by Investment Bank B in or about 2016, TAYLOR continued receiving MNPI from insiders at at least one investment bank, and provided that MNPI to CC-1 and CC-2 in order to continue the scheme.

     20.  BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, were compensated by CC-1 and CC-2 in exchange for the MNPI that they misappropriated.  TAYLOR specifically continued receiving payments for the MNPI he had misappropriated through at least the summer of 2018. During the course of the conspiracy, CC-1

and CC-2 provided TAYLOR with over $1 million of benefits, including cash, hotel rooms and dinners, luxury watches, and expensive clothes.   TAYLOR often received cash from CC-1 and/or CC-2 in person at the Apartment.   WINDSOR well understood that she was being compensated in exchange for the MNPI that she was misappropriating, and in or about February 2013 she created a spreadsheet to forecast how illegal proceeds would be split amongst herself, TAYLOR, and CC-3.

### Statutory Allegations

21.   From at least in or about December 2012 through in or about the summer of 2018, in the Southern District of New York and elsewhere, BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, (a) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, and (b) fraud in connection with a tender offer, in violation of Title 15, United States Code, Sections 78n(e) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.14e-3(a) and 240.14e-3(d).

22.   It was a part and object of the conspiracy that BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, and others known and unknown, willfully and knowingly, directly and

12

indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons.

23. It was a further part and an object of the conspiracy that BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, and others known and unknown, willfully and knowingly would and did engage in fraudulent, deceptive, and manipulative acts and practices in connection with a tender offer, in that after an offering person had taken substantial steps to commence a tender offer, TAYLOR and WINDSOR, while in possession of material information relating to such tender offer, which information they knew and had reason to know was non-public and which they knew and had reason to know had been acquired directly and indirectly from the offering person, the issuer of the

13

securities sought and to be sought by such tender offer, and an officer, director, partner, and employee and other person acting on behalf of the offering person and such issuer: (a) purchased and sold and caused to be purchased and sold; and (b) communicated such material, non-public information under circumstances in which it was reasonably foreseeable that such communication would likely result in the purchase and sale of such securities and securities convertible into and exchangeable for such securities and options and right to obtain and to dispose of such securities and options, without such information and its source having been publicly disclosed by press release and otherwise within a reasonable time prior to such purchase and sale, in violation of Title 15, United States Code, Sections 78n(e) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.14e-3(a) and 240.14e-3(d).

## Overt Acts

24.   In furtherance of the conspiracy, and to effect the illegal objects thereof, BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about December 2012, TAYLOR, while employed as an analyst at Investment Bank A, accessed files on Investment

Bank A's computer network relating to the potential acquisition of Metals.

      b.   On or about May 12, 2014, CC-3 purchased 83,037 common shares of Idenix.   CC-3 made the purchases using an online brokerage account.

      c.   On or about February 19, 2015, WINDSOR, while employed as an associate at Investment Bank B, accessed a file on Investment Bank B's computer network relating to the potential acquisition of Pharmacyclics.

      (Title 18, United States Code, Section 371.)

### COUNT TWO
**(Conspiracy to Commit Wire Fraud and Securities Fraud)**

The Grand Jury further charges:

    25.   The allegations contained in paragraphs 1 through 20 and 24 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

    26.   From at least in or about December 2012 through in or about the summer of 2018, in the Southern District of New York and elsewhere, BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit (a) wire fraud, in violation of Title 18, United States Code, Section 1343; and (b)

securities fraud, in violation of Title 18, United States Code, Section 1348.

27.  It was a part and an object of the conspiracy that BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

28.  It was further a part and an object of the conspiracy that BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, and others known and known, willfully and knowingly would and did execute a scheme and artifice to (a) defraud persons in connection with securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of an issuer with a

class of securities registered under Section 12 of the
Securities Exchange Act of 1934 and that was required to file
reports under Section 15(d) of the Securities Exchange Act of
1934, in violation of Title 18, United States Code, Section
1348.

(Title 18, United States Code, Section 1349.)

**COUNTS THREE THROUGH EIGHTEEN**
**(Securities Fraud)**

The Grand Jury further charges:

29.   The allegations contained in paragraphs 1 through 20
and 24 of this Indictment are hereby repeated, realleged, and
incorporated by reference, as if fully set forth herein.

30.   On or about the dates set forth below, in the Southern
District of New York and elsewhere, BENJAMIN TAYLOR and DARINA
WINDSOR, the defendants, willfully and knowingly, directly and
indirectly, by the use of means and instrumentalities of
interstate commerce, and of the mails, and of facilities of
national securities exchanges, used and employed in connection
with the purchase and sale of securities manipulative and
deceptive devices and contrivances, in violation of Title 17,
Code of Federal Regulations, Section 240.10b-5, by: (a)
employing devices, schemes, and artifices to defraud; (b) making
untrue statements of material fact and omitting to state
material facts necessary in order to make the statements made,

17

in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, TAYLOR and WINDSOR stole and supplied, in breach of a duty, material non-public information to various co-conspirators in anticipation that those individuals and others would use that information to execute timely securities transactions, which they did, including the securities transactions listed below on or about the dates listed below:

| Count | Defendant | Transaction Date | Company | Transactions |
|-------|-----------|------------------|---------|--------------|
| 3 | TAYLOR | In or about December 2012 and January 2013 | Metals | Purchases of at least approximately:<br>• 12,000 common shares;<br>• 1,822 spread bet contracts; and<br>• 3,500 contracts for difference ("CFDs") |
| 4 | TAYLOR | In or about January 2013 | Life | Purchases of at least approximately:<br>• 9,500 common shares;<br>• 100 call option contracts;<br>• 1,000 spread bet contracts;<br>• 500 spread bet call option contracts;<br>• 8,888 CFDs; and<br>• 10 CFD call option contracts |

| 5 | TAYLOR and WINDSOR | In or about February and March 2013 | ABC | Purchases of at least approximately:<br>• 30,000 common shares;<br>• 695 call option contracts;<br>• 1,600 spread bet contracts; and<br>• 16,000 CFDs |
|---|---|---|---|---|
| 6 | TAYLOR | In or about April 2013 | Life | Purchases of at least approximately:<br>• 100 call option contracts;<br>• 1,227 spread bet contracts;<br>• 1,224 spread bet call option contracts; and<br>• 18,000 CFDs |
| 7 | TAYLOR and WINDSOR | In or about April and May 2013 | Heidrick | Purchases of at least approximately 1,830 spread bet contracts |
| 8 | TAYLOR and WINDSOR | In or about June 2013 | Onyx | Purchases of at least approximately:<br>• 57,200 common shares;<br>• 244 call option contracts;<br>• 1,300 spread bet contracts;<br>• 500 spread bet call option contracts; and<br>• 20,500 CFDs |
| 9 | TAYLOR and WINDSOR | In or about April through August 2014 | Intermune | Purchases of at least approximately:<br>• 149,005 common shares;<br>• 400 call option contracts; and<br>• 353,000 CFDs |

| 10 | TAYLOR and WINDSOR | In or about May and June 2014 | Idenix | Purchases of at least approximately:<br>• 321,647 common shares; and<br>• 496,089 CFDs |
|----|----|----|----|----|
| 11 | TAYLOR and WINDSOR | In or about November 2014 | Avanir | Purchases of at least approximately:<br>• 25,000 common shares; and<br>• 35,111 CFDs |
| 12 | TAYLOR and WINDSOR | In or about March 2015 | Hyperion | Purchases of at least approximately 276,272 CFDs |
| 13 | TAYLOR and WINDSOR | In or about March 2015 | Pharmacyclics | Purchases of at least approximately:<br>• 500 call option contracts; and<br>• 165,000 CFDs |
| 14 | TAYLOR and WINDSOR | In or about March and April 2015 | Receptos | Purchases of at least approximately:<br>• 26,000 common shares;<br>• 255 call option contracts; and<br>• 262,119 CFDs |
| 15 | TAYLOR and WINDSOR | In or about April and May 2015 | Omnicare | Purchases of at least approximately:<br>• 25,000 common shares;<br>• 30 call option contracts; and<br>• 411,548 CFDs |
| 16 | TAYLOR and WINDSOR | In or about July 2015 | Thoratec | Purchases of at least approximately 300,000 CFDs |
| 17 | TAYLOR and WINDSOR | In or about August and September 2015 | Solera | Purchases of at least approximately:<br>• 65,888 common shares;<br>• 100 call option contracts; and<br>• 457,815 CFDs |

| 18 | TAYLOR and WINDSOR | In or about September and October 2015 | EnerSys | Purchases of at least approximately 62,000 CFDs |

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNTS NINETEEN THROUGH TWENTY-THREE
### (Fraud in Connection with Tender Offers)

The Grand Jury further charges:

31.   The allegations contained in paragraphs 1 through 20 and 24 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

32.   On or about the dates set forth below, in the Southern District of New York and elsewhere, BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, willfully and knowingly engaged in fraudulent, deceptive, and manipulative acts and practices in connection with a tender offer, in that after an offering person had taken substantial steps to commence a tender offer, TAYLOR and WINDSOR, while in possession of material information relating to such tender offer, which information they knew and had reason to know was non-public and which they knew and had reason to know had been acquired directly and indirectly from the offering person, the issuer of the securities sought and to be sought by such tender offer, and an officer, director, partner, and employee and other person acting on behalf of the offering person and such issuer: (a) purchased and sold and

caused to be purchased and sold; and (b) communicated such material, non-public information under circumstances in which it was reasonably foreseeable that such communication would likely result in the purchase and sale of such securities and securities convertible into and exchangeable for such securities and options and right to obtain and to dispose of such securities and options, without such information and its source having been publicly disclosed by press release and otherwise within a reasonable time prior to such purchase and sale, to wit, TAYLOR and WINDSOR stole and supplied material non-public information to various co-conspirators in anticipation that those individuals and others would use that information to execute timely securities transactions before that information became public, which they did, including the securities transactions listed below on or about the dates listed below:

| Count | Defendant | Transaction Date | Company | Transactions |
|-------|-----------|------------------|---------|--------------|
| 19 | TAYLOR and WINDSOR | In or about June 2013 | Onyx | Purchases of at least approximately:<br>• 57,200 common shares;<br>• 244 call option contracts;<br>• 1,300 spread bet contracts;<br>• 500 spread bet call option contracts; and<br>• 20,500 CFDs |

| 20 | TAYLOR and WINDSOR | In or about May and June 2014 | Idenix | Purchases of at least approximately: <ul><li>321,647 common shares; and</li><li>496,089 CFDs</li></ul> |
|----|--------------------|-------------------------------|--------|-----------------------------------|
| 21 | TAYLOR and WINDSOR | In or about November 2014 | Avanir | Purchases of at least approximately: <ul><li>25,000 common shares; and</li><li>35,111 CFDs</li></ul> |
| 22 | TAYLOR and WINDSOR | In or about March 2015 | Hyperion | Purchases of at least approximately 276,272 CFDs |
| 23 | TAYLOR and WINDSOR | In or about March and April 2015 | Receptos | Purchases of at least approximately: <ul><li>26,000 common shares;</li><li>255 call option contracts; and</li><li>262,119 CFDs</li></ul> |

(Title 15, United States Code, Sections 78n(e) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.14e-3(a) &
240.14e-3(d); and Title 18, United States Code, Section 2.)

## COUNTS TWENTY-FOUR THROUGH THIRTY-NINE
### (Wire Fraud)

The Grand Jury further charges:

33.   The allegations contained in paragraphs 1 through 20
and 24 of this Indictment are hereby repeated, realleged, and
incorporated by reference, as if fully set forth herein.

34.   On or about the dates set forth below, in the Southern
District of New York and elsewhere, BENJAMIN TAYLOR and DARINA
WINDSOR, the defendants, willfully and knowingly, having devised
and intending to devise a scheme and artifice to defraud, and
for obtaining money and property by means of false and

fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, through the use of interstate wires, including interstate and international telephone calls, TAYLOR and WINDSOR participated in a scheme to defraud at least Investment Bank A, Investment Bank B, Reliance, Life, ABC, Heidrick, Onyx, Intermune, Idenix, Avanir, Hyperion, Pharmacyclics, Receptos, Omnicare, Thoratec, Solera, and Johnson Controls of valuable confidential information by deceptively converting that information to their own use and the use of others in breach of fiduciary and other duties owed to the subject companies for the purpose of committing insider trading and executing the securities transactions listed below:

| Count | Defendant | Transaction Date | Company | Transactions |
|-------|-----------|------------------|---------|--------------|
| 24 | TAYLOR | In or about December 2012 and January 2013 | Metals | Purchases of at least approximately:<br>• 12,000 common shares;<br>• 1,822 spread bet contracts; and<br>• 3,500 CFDs |
| 25 | TAYLOR | In or about January 2013 | Life | Purchases of at least approximately:<br>• 9,500 common shares;<br>• 100 call option contracts;<br>• 1,000 spread bet contracts;<br>• 500 spread bet call option contracts;<br>• 8,888 CFDs; and<br>• 10 CFD call option contracts |
| 26 | TAYLOR and WINDSOR | In or about February and March 2013 | ABC | Purchases of at least approximately:<br>• 30,000 common shares;<br>• 695 call option contracts;<br>• 1,600 spread bet contracts; and<br>• 16,000 CFDs |
| 27 | TAYLOR | In or about April 2013 | Life | Purchases of at least approximately:<br>• 100 call option contracts;<br>• 1,227 spread bet contracts;<br>• 1,224 spread bet call option contracts; and<br>• 18,000 CFDs |

| 28 | TAYLOR and WINDSOR | In or about April and May 2013 | Heidrick | Purchases of at least approximately 1,830 spread bet contracts |
|---|---|---|---|---|
| 29 | TAYLOR and WINDSOR | In or about June 2013 | Onyx | Purchases of at least approximately:<br>• 57,200 common shares;<br>• 244 call option contracts;<br>• 1,300 spread bet contracts;<br>• 500 spread bet call option contracts; and<br>• 20,500 CFDs |
| 30 | TAYLOR and WINDSOR | In or about April through August 2014 | Intermune | Purchases of at least approximately:<br>• 149,005 common shares;<br>• 400 call option contracts; and<br>• 353,000 CFDs |
| 31 | TAYLOR and WINDSOR | In or about May and June 2014 | Idenix | Purchases of at least approximately:<br>• 321,647 common shares; and<br>• 496,089 CFDs |
| 32 | TAYLOR and WINDSOR | In or about November 2014 | Avanir | Purchases of at least approximately:<br>• 25,000 common shares; and<br>• 35,111 CFDs |
| 33 | TAYLOR and WINDSOR | In or about March 2015 | Hyperion | Purchases of at least approximately 276,272 CFDs |
| 34 | TAYLOR and WINDSOR | In or about March 2015 | Pharmacyclics | Purchases of at least approximately:<br>• 500 call option contracts; and<br>• 165,000 CFDs |

| 35 | TAYLOR and WINDSOR | In or about March and April 2015 | Receptos | Purchases of at least approximately:<br>• 26,000 common shares;<br>• 255 call option contracts; and<br>• 262,119 CFDs |
| 36 | TAYLOR and WINDSOR | In or about April and May 2015 | Omnicare | Purchases of at least approximately:<br>• 25,000 common shares;<br>• 30 call option contracts; and<br>• 411,548 CFDs |
| 37 | TAYLOR and WINDSOR | In or about July 2015 | Thoratec | Purchases of at least approximately 300,000 CFDs |
| 38 | TAYLOR and WINDSOR | In or about August and September 2015 | Solera | Purchases of at least approximately:<br>• 65,888 common shares;<br>• 100 call option contracts; and<br>• 457,815 CFDs |
| 39 | TAYLOR and WINDSOR | In or about September and October 2015 | EnerSys | Purchases of at least approximately 62,000 CFDs |

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FORTY
### (Securities Fraud)

The Grand Jury further charges:

35.   The allegations contained in paragraphs 1 through 20 and 24 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

36.   From at least in or about December 2012 through in or about September 2015, in the Southern District of New York and

elsewhere, BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, willfully and knowingly executed a scheme and artifice to (a) defraud persons in connection with securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit, TAYLOR and WINDSOR supplied, in breach of a duty, material non-public information stolen from at least Investment Bank A, Investment Bank B, Reliance, Life, ABC, Heidrick, Onyx, Intermune, Idenix, Avanir, Hyperion, Pharmacyclics, Receptos, Omnicare, Thoratec, Solera, and Johnson Controls to co-conspirators, in anticipation that co-conspirators would trade using such information, and co-conspirators did trade using the information.

(Title 18, United States Code, Sections 1348 and 2.)

## FORFEITURE ALLEGATIONS

37.   As a result of committing one or more of the offenses alleged in Counts One through Forty of this Indictment, BENJAMIN TAYLOR and DARINA WINDSOR, the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Forty of this Indictment, that the defendants personally obtained.

### Substitute Assets Provision

38.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        a.   cannot be located upon the exercise of due diligence;

        b.   has been transferred or sold to, or deposited with, a third party;

        c.   has been placed beyond the jurisdiction of the court;

        d.   has been substantially diminished in value; or

        e.   has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any

other property of the defendants up to the value of the

forfeitable property described above.

            (Title 18, United States Code, Section 981;
              Title 21, United States Code, Section 853;
      and Title 28, United States Code, Section 2461.)


_____
FOREPERSON

Audrey Strauss (pen)
Audrey Strauss
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. § 515

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

— v. —

BEJAMIN TAYLOR AND
DARINA WINDSOR,

Defendants.

### SEALED SUPERSEDING INDICTMENT

S7 18 Cr. 184 (VSB)

(Title 15, United States Code, Sections
78j(b),78n(e), and 78ff; Title 17, Code of
Federal Regulations, Sections 240.10b-5,
240.14e-3(a), and 240.14e-3(d); Title 18,
United States Code, Sections 2, 371, 1343,
1348 and 1349.)

_____
Foreperson

AUDREY STRAUSS
Attorney for the
United States
Acting Under
 Authority
Conferred by
28 U.S.C. § 515

9/9/19  FILED INDICTMENT, WARRANTS ISSUED

COTJ ✓ PM